## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

**KELLY LEIBFRIED,**
*Individually and as Special Administrator of the Estate of Charles Leibfried*, **et al.,**

     **Plaintiffs,**

  **v.**        **Case No. 20-CV-1874**

**CATERPILLAR, INC,**

     **Defendant.**

---

## DECISION AND ORDER

---

### 1. Background

Charles Leibfried died when the Caterpillar articulated dump truck he was driving rolled over. Kelly Leibfried, on her own behalf as Charles's wife and as special administrator of Charles's estate, brought this action against Caterpillar, Inc., alleging that Charles's death was caused by the defective design of its dump truck. Joining Kelly as a plaintiff is Sentry Insurance Company, which provided worker's compensation benefits related to Charles's death. (ECF No. 1, ¶ 16.)

Before the court are five motions regarding expert witnesses. The plaintiffs seek to supplement the report of Dr. Stephen Hargarten. (ECF No. 33.) The defendant seeks

to exclude Hargarten's opinions as well as those of Dr. Brad Grunert. (ECF Nos. 37 and 39.) It also seeks oral argument. (ECF No. 50.) The plaintiff also asks for "an extension of time … to file supplemental briefing in response to Caterpillar's motions to bar the testimony of Dr. Stephen Hargarten and Brad Grunert, with the supplemental briefing being limited to the testimony of Dr. Kimball Fuiks, which was given on June 5, 2023." (ECF No. 51.)

## 2. Defendant's Motion for Oral Argument

The court rarely finds oral argument necessary. The defendant has not demonstrated it is necessary here. Because the parties have had the opportunity to fully develop their arguments in their briefs, the defendant's motion for oral argument (ECF No. 50) will be denied.

## 3. Motion to File Supplemental Briefs

The plaintiffs state that the court should defer resolving the pending motions to exclude the plaintiffs' experts and permit additional briefing in light of the deposition testimony of the defendant's medical expert. They state that they believe the defense expert's "testimony is relevant to, and bears directly on, the court's consideration of Caterpillar's motion [sic]." (ECF No. 52 at 1.)

As discussed below, Hargarten's opinions as to Charles's consciousness following the rollover are not properly before the court for procedural reasons. An expert's

testimony is not relevant to the court's procedural analysis, and thus the plaintiffs have failed to demonstrate any basis for supplemental briefing.

Nor have the plaintiffs demonstrated that additional briefing is relevant to the substantive analysis of Grunert's opinion. Even presuming that the defendant's expert could fill the gaps identified in Grunert's opinion, it would not change the court's conclusion. An expert's opinion must stand on its own; a party cannot cobble together an expert's opinion by pulling together the opinions, reports, and testimony of other experts. Therefore, the plaintiffs' motion for supplemental briefing (ECF No. 51) will be denied.

### 4. Dr. Stephen Hargarten

The plaintiffs retained Hargarten, a professor of emergency medicine, "as an expert to testify as to his opinions regarding the cause of death of Charles Leibfried." (ECF No. 35-4 at 4.) He provided a one-and-a-half page report in which he stated:

> [W]hen the rollover event occurred, the decedent's head, neck and chest were in a dependent position, with his head and neck in dirt and debris. His chin was against his chest. The additional findings of petechiae and congestion, limited to his upper body are typical of mechanical/positional asphyxiation. There was no evidence of a brain injury or stroke nor evidence of spinal cord injury but there was noted compression fracture of C 6.
>
> It is my opinion that the decedent died after several minutes of positional asphyxia secondary to the mechanical compression of his body.

(ECF No. 35-1 at 3.) The report offered no other opinions.

At Hargarten's deposition, after the defendant had completed its questioning, counsel for the plaintiff asked Hargarten: "Doctor, in reviewing the material that you've been provided, have you formed any opinions that you're prepared to offer at trial regarding the status of Charles Leibfried's consciousness before, during, and after the rollover event?" (ECF No. 35-2 at 37:15-19.) The defendant objected on the ground that no such opinion had been disclosed in either his report or the plaintiffs' Rule 26 disclosure. (ECF No. 35-2 at 37:20-23.) Hargarten proceeded to state that it was his opinion that Charles was conscious "for some period of time as that rollover event occurred" (ECF No. 35-2 at 39:9-11), which he estimated as between two to four minutes (ECF No. 35-2 at 41:3).

Immediately following his deposition Hargarten wrote a letter to plaintiffs' counsel in which he stated:

> It is my opinion, consistent with my opinion of the cause of death, that Leibfried's loss of consciousness was due to a lack of oxygenation, secondary to the mechanical asphyxia. It is my opinion that Mr. Leibfried was in some level of consciousness for up to 4 minutes, due to the brain being deprived of oxygen.

(ECF No. 35-3.) The plaintiffs ask that Hargarten be allowed to supplement his report with this additional opinion. (ECF No. 33.) They argue that Hargarten simply presumed that Charles was conscious for some period of time but, because he is not a professional expert witness, he failed make his presumption clear in his report. (ECF No. 34 at 4-5.)

A problem with the plaintiffs' attempt to blame Hargarten for the omission is that there is no indication that they asked him to offer an opinion about Charles's consciousness. According to their Rule 26(a)(2) disclosures, they retained Hargarten solely to offer an opinion about the cause of Charles's death. (ECF No. 35-4 at 4.) Whether Charles was conscious for any period of time following the rollover is a different question and one the plaintiffs did not disclose they retained Hargarten to answer.

The plaintiffs' contention that Hargarten's new opinion is merely a supplementation of his report under Fed. R. Civ. P. 26(e)(2) is also unpersuasive. It is a new opinion going beyond anything he said in his report.

"The exclusion of non-disclosed evidence is 'mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless.'" *Rossi v. City of Chicago*, 790 F.3d 729, 738 (7th Cir. 2015) (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004)); *Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825 (7th Cir. 2010) ("The sanction for failure to comply with this rule is the 'automatic and mandatory' exclusion from trial of the omitted evidence, 'unless non-disclosure was justified or harmless.'" (quoting *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 869 (7th Cir. 2005)); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

The plaintiffs' expert witness reports were due by April 21, 2022. (ECF No. 28.) Hargarten offered his new opinion almost ten months later, on February 17, 2023. (ECF

No. 35-3.) Although he offered his new opinion before his deposition was over, it was by only a matter of minutes. Defense counsel could have questioned Hargarten blindly about this new opinion but, aside from a lack of time to prepare, he did not have the benefit of a written report about the new opinion. This sequence—report and then deposition—is so fundamental to the orderly and efficient processing of litigation that it is codified in Federal Rule of Civil Procedure 26(b)(4)(A).

Having said that, Hargarten offered his new opinion over a month before the March 31, 2023, deadline for the defendant to disclose its experts and over three months before the May 31, 2023, discovery deadline. (ECF No. 32.) Therefore, much of the prejudice associated with the plaintiffs' tardiness in disclosing Hargarten's new opinion perhaps could have been mitigated through a response by an expert hired by the defendant and a second deposition of Hargarten. *See* David, 324 F.3d at 857 (identifying "(1) the prejudice or surprise to the party against whom the evidence is offered; [and] (2) the ability of the party to cure the prejudice" as two factors the court should consider when assessing whether untimeliness was substantially justified or harmless under Fed. R. Civ. P. 37(c)(1)).

But tardiness was not the only way in which the plaintiffs failed to comply with Fed. R. Civ. P. 26(a)(2)(B). Most materially, Hargarten failed to articulate "the basis and reasons" for his opinion that Charles remained conscious following the rollover. *See*

Fed. R. Civ. P. 26(a)(2)(B)(i). On that basis the defendant moved to exclude Hargarten's

opinion that Charles was initially conscious following the rollover. (ECF No. 37.)

In response to the defendant's motion, on April 13, 2023, the plaintiffs provided

an affidavit from Hargarten, which included the sort of information that Fed. R. Civ. P.

26(a)(2)(B)(i) requires an expert to provide in his report. Specifically, he described his

methodology as that of differential diagnosis and outlined how he applied that

methodology to the facts to reach his opinion that Charles remained conscious

following the rollover. He also elaborated on this opinion. In material part he stated:

> a. There is no evidence that Mr. Leibfried lost consciousness prior to the accident.
>
> b. Rather, Mr. Leibfried lost consciousness as a result of not being able to breathe, and the resulting lack of oxygen to his brain.
>
> c. After the failure of the Roll Over Protection Structure, and the resulting compression, Mr. Leibfried's consciousness slowly deteriorated over a period of two to four minutes.

(ECF No. 44, ¶ 11.)

In reply the defendant argues that "[t]he Court should disregard this affidavit as

yet another attempt to offer a late supplementation to Dr. Hargarten's expert opinions

and testimony." (ECF No. 48 at 1.)

Hargarten's affidavit constitutes another untimely expert report and, this time,

the prejudice to the defendant is self-evident. Not only was it offered nearly a year after

the deadline set by the court, but it came after the defendant's deposition of Hargarten,

after the deadline for the defendant to disclose its experts, and after the defendant moved to exclude Hargarten's additional opinion.

Insofar as the plaintiffs seek to fault the defendant for not questioning Hargarten at his deposition about the bases for his new opinion (*see* ECF No. 43 at 1 ("The flaw in Caterpillar's motion is that, during the deposition of Dr. Hargarten, Caterpillar's counsel simply failed to ask any questions relevant to Rule 702 and *Daubert*."); *see also* ECF No. 43 at 4, 7-8), the argument ignores the plaintiffs' Rule 26 obligations. "[A] complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them," among other things, must be contained in the expert's report. Fed. R. Civ. P. 26(a)(2)(B); *see also* Fed. R. Civ. P. 26(b)(4)(A) (stating that a deposition of an expert may occur only after the expert provides a report). "[T]he report … is intended to set forth the substance of the direct examination [and] should be written in a manner that reflects the testimony to be given by the witness …." Fed. R. Civ. P. 26, Notes of Advisory Committee on Rules, 1993 Amendment. The opponent has no obligation to remedy deficits in an expert's report and probe omitted elements through a deposition.

The bases for Hargarten's new opinion as set forth in his affidavit are not mere explanation, elaboration, or supplementation but central elements of an expert's report that were missing. The Rule 26(e) obligation to supplement is not a license to comply with the expert disclosure requirements piecemeal—one opinion on May 2, 2022 (ECF

No. 44-2), then another opinion more than nine months later (ECF No. 44-3), and then the explanation for that opinion more than two months after that (ECF No. 44). Nor is it a safety net for a party's errors in complying with its disclosure obligations. Rule 26(e) merely underscores that the disclosure obligations are ongoing; a party cannot ignore omissions from or misinformation in the expert report on the ground that it only came to light after its initial expert disclosures were completed. To read Rule 26(e) as the plaintiffs propose would be inconsistent with Rule 37(c)(1), which mandates the exclusion of untimely disclosures unless the tardiness was harmless or substantially justified.

The plaintiffs' response to the defendant's motion to exclude Hargarten's opinion that Charles was conscious following the rollover rests entirely on Hargarten's affidavit. Having concluded that Hargarten's affidavit is an untimely expert report and not properly before the court, *see* Fed. R. Civ. P. 37(c)(1), the court must grant the defendant's motion to exclude Hargarten's "opinions regarding whether Mr. Leibfried was conscious in the minutes after his accident" (ECF No. 37). It is not necessary for the court to consider the defendant's alternative argument that, even considering Hargarten's affidavit, his opinion remains deficient under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). And having concluded that this opinion must be excluded for independent reasons, the plaintiffs' motion to file an untimely expert report (ECF No. 33) is moot and dismissed as such.

### 5. Dr. Brad Grunert

The admissibility of expert opinions is governed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 871 (7th Cir. 2021). Under Rule 702, the court acts as gatekeeper to ensure that proffered expert testimony is both relevant and reliable. *Id.* at 872 (quoting *Daubert*, 509 U.S. at 589). "In performing this role, the district court must engage in a three-step analysis, evaluating: '(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony.'" *Id.* (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)).

The fact that an expert is qualified to give an opinion is not by itself a sufficient basis for admissibility. *Id.* at 873. In assessing the reliability of an expert opinion, courts may consider the following non-exhaustive factors:

> (1) Whether the particular scientific theory can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

*Id.* (quoting *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)) (internal brackets and quotation marks omitted); *see also Gopalratnam*, 877 F.3d at 779-80 (discussing additional factors outlined in the Notes of Advisory Committee on Rules to the 2000 Amendment of Rule 702).

Because there are many different kinds of experts and expertise, the test for reliability is flexible, and no one factor is dispositive. *Kirk*, 991 F.3d at 873; *Gopalratnam*, 877 F.3d at 780. Courts must be mindful that they are not assessing the correctness of the expert's opinion but merely the soundness of the expert's methods. *Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."); *Kirk*, 991 F.3d at 873; *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019) ("The focus is on the expert's methodology, not his ultimate conclusions."). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment." *Gopalratnam*, 877 F.3d at 781 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); citing *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013)).

Grunert is a licensed psychologist who opined that, following the rollover but before he died, Charles "would have initially experienced a sense of fear and anxiety," which "escalated to feelings of terror and horror" and "feelings of helplessness, hopelessness and despair." (ECF No. 40-2 at 4.) Grunert relied on Hargarten's opinion that it took up to four minutes for Charles to die following the rollover and assumed that Charles remained conscious during that period. (ECF No. 40-2 at 3-4.) He based his opinion on his "work with hundreds of individuals who have survived life-threatening situations." (ECF No. 40-2 at 4.) He stated that his patients

describe the rapid escalation from anxiety and fear to terror and horror as they realize that they are in imminent danger of dying or sustaining mutilating injuries. Furthermore, they describe feelings of helplessness and hopelessness if they are unable to free themselves from the situation in which they are trapped. For individuals who feel an impending loss of consciousness, they describe a sense of despair and profound horror as they face their imminent death.

(ECF No. 40-2 at 4.) He stated his "opinions are rendered to a reasonable degree of psychological probability." (ECF No. 40-2 at 4.)

Grunert also submitted an affidavit in response to the defendant's motion to exclude his testimony. (ECF No. 47.) Insofar as it offers any new or expanded opinion or attempts to belatedly provide what was required to be included in his initial report, it is, like Hargarten's, an untimely expert report. (ECF No. 47.) For the same reasons it denied Hargarten's untimely reports, the court also disregards Grunert's affidavit as an untimely expert report.

The defendant challenges Grunert's qualifications only with respect to the following opinion: "There certainly is no indication that he would have lost consciousness as a result of the crash secondary to a head injury based upon the medical examiner's report. As such, he could be expected to be fully aware of the situation that he was in." (ECF No. 40-2 at 4.) The court agrees that the plaintiffs have not shown that Grunert is qualified to offer an opinion as to whether Charles was conscious following the rollover. But that does not require the exclusion of Grunert's opinion regarding the emotions Charles felt in the minutes before he died. Grunert may

assume that Charles was conscious and leave it to the plaintiffs to prove that underlying assumption at trial. *See Hydraulics Int'l, Inc. v. Amalga Composites, Inc.*, No. 20-CV-371, 2022 U.S. Dist. LEXIS 166539, at *36 (E.D. Wis. Sep. 15, 2022).

As to his opinion regarding the emotions Charles felt in the minutes before he died, Grunert relied on his recollection of statements from hundreds of individuals he treated for psychological injuries following a near-death experience.

The notion that persons facing life-threatening situations tend to feel fear, anxiety, terror, horror, helplessness, hopelessness, and despair seems intuitive, bordering on common sense. But the seeming accuracy of an opinion is not a reason to allow it if based on an unsound methodology any more than a court's doubts as to an expert's conclusion is a reason to exclude the opinion if based on a sound methodology. *Cf. Daubert*, 509 U.S. at 595; *Kirk*, 991 F.3d at 873; *Kopplin*, 914 F.3d at 1104.

Similarly, the congruity between Grunert's experience and the nature of his opinions—a psychologist opining on emotions—presents a superficial sheen of expertise. Notwithstanding his assertion that his "opinions are rendered to a reasonable degree of psychological probability" (ECF No. 40-2 at 4), in recounting his impressions of what hundreds of individuals told him he does not purport to employ any aspect of the science of psychology. Based on his report, Grunert's experience as a psychologist is relevant to his opinion only because it gave him the opportunity to hear from hundreds of individuals who experienced traumatic events. Anyone in a position to regularly talk

to persons who survived traumatic experiences—for example, police officers, paramedics, journalists, or personal injury lawyers—could inquire about the emotions those individuals experienced and presumably offer an opinion similar to that offered by Grunert.

The court raises these points about what its analysis is *not* about to highlight what it *is* about—the reliability of Grunert's methodology. Specifically, the court's focus is on whether Grunert's "testimony is the product of reliable principles and methods," Fed. R. Evid. 702(c), and whether he "has reliably applied the principles and methods to the facts of the case," Fed. R. Evid. 702(d).

The plaintiffs argue that Rule 702 allows for opinions based on experience. (ECF No. 46 at 2-6.) And it is true that "relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). However, care must be taken so as to not conflate the qualifications and methodology elements of the Rule 702 analysis. While an expert may be qualified by experience (as opposed to formal training or education), experience is not necessarily a substitute for employing a reliable methodology. *See Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019) ("even a 'supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method'" (quoting *Smith*, 215 F.3d at 718)).

Nonetheless, certain types of expertise do not lend themselves to traditional scientific testing. For example, opinions such as the standard of care in a medical malpractice case or the reasonableness of a police officer's actions in an excessive force case are significantly informed by experience. *Cf. Kumho Tire*, 526 U.S. at 150 (citing Brief for United States as *Amicus Curiae* which in turn cited "cases involving experts in drug terms, handwriting analysis, criminal *modus operandi*, land valuation, agricultural practices, railroad procedures, attorney's fee valuation, and others"); *Kirk*, 991 F.3d at 876 (An expert "may sometimes draw a conclusion based on only their extensive and specialized experience." (internal quotation marks omitted)). But an expert who relies on his experience still "must substantiate his opinion, rather than assume it to be true." *Kirk*, 991 F.3d at 876 (internal quotation marks omitted).

The fact that an expert's opinions might not fit squarely within the *Daubert* framework means only that the court must be careful to apply the *Daubert* framework flexibly to account for the nature of the expertise. *See Kumho Tire*, 526 U.S. at 150-52. "That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id.* at 152.

### 5.1. Whether the particular scientific theory can be (and has been) tested

Turning to the *Daubert* factors and, first, whether the particular scientific theory can be (and has been) tested, it is obviously impossible to test what emotions Charles

subjectively experienced as he died. Nor could anyone test what individuals commonly feel as they die; the deceased are not available for interviews. Instead, Grunert relied on individuals who survived life-threatening situations, and specifically those who obtained treatment for resulting psychological injuries, to assess the emotions felt by persons when they believed they were about to die. The court presumes (and the defendant does not argue otherwise) that a study of persons who survive near-death experiences regarding the emotions they felt when they believed they were about to die would be relevant to assessing the emotions likely felt by a person who died from a traumatic event.

However, it is difficult to characterize anything Grunert did as a "test." Granted, because Grunert based his opinion on what hundreds of patients told him over decades, his opinions could not be fairly characterized as being based on "subjective belief or unsupported speculation," *Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999). But Grunert did not do anything with that data, either qualitatively or quantitatively, that could be deemed scientific.

A person's general impression as to trends or patterns may serve as a useful hypothesis, but a hypothesis is the beginning rather than the end of the scientific method. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593 (1993) (quoting E.

Green & C. Nesson, Problems, Cases, and Materials on Evidence 645 (1983))); *see also*

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (affirming district court's

exclusion of expert opinion when expert "made no attempt to test his hypothesis" and

instead purported to rely on "nothing more than his engineering background and

experience to conclude that the caster stem collapsed on account of a brittle fracture

brought on by overtightening"); *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017)

(holding that the district court erred in admitting an expert opinion because the expert

"presented a hypothesis only—he failed to validate it with testing").

Testing is crucial in science because initial impressions may be colored by biases

and presumptions and often prove incorrect. A person who attributes significance to a

particular fact may be especially attuned to recognizing when that fact arises, thus

leading to the impression that it arises more than it does. To be reliable, an impression

must be confirmed through testing that employs appropriate principles and methods.

As noted above, certain types of opinions do not lend themselves to objective

testing. But Grunert's opinions do not fall into that category. One means of testing

Grunert's hypothesis that individuals experience specific emotions in a particular

sequence in the moments they believe they are about to die is through a survey of

survivors of comparable events. Although Grunert listened to reports of hundreds of

persons, he forewent the formalities and rigors of anything akin to a survey and instead

relied on his recollection to identify commonalities, trends, and frequencies.

### 5.2. Whether the theory has been subjected to peer review and publication

Granted, surveys can be both expensive and time consuming, and therefore it may not be practical to conduct a survey to answer the question of what emotions Charles likely experienced in the moments before he died. But such a criticism highlights that Grunert cannot simply call upon an established body of research to answer the question the plaintiffs retained him to answer and underscores the absence of support for Grunert's theory.

Expert witnesses rarely rely on original science to answer questions presented in litigation. In fact, the novelty of the science underlying the expert's opinion is a factor weighing against its admission. *See Gopalratnam*, 877 F.3d at 779 ("whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation'" (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment)). Rather, experts tend to take established scientific principles, methods, and theories and apply them to the facts of the case.

Reliance on established science is not feasible here because Grunert's theory has not been subject to peer review or publication by him or anyone else. Grunert has not pointed to any published or peer reviewed study, article, or paper supporting his theory. (ECF No. 40-1 at 10, 34:2-3.) While publication or peer review is not required, "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in

methodology will be detected. *Daubert*, 509 U.S. at 593. The plaintiffs do not suggest that the absence of peer review or publication can be attributable to an absence of such forums for opinions like Grunert's.

Nor have the plaintiffs established that Grunert's opinions are the sort that would generally be accepted within any scientific community. *Cf. Gopalratnam*, 877 F.3d at 780 ("[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting" (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment)). Specifically, the plaintiffs have not demonstrated that a psychologist's recollection of patient statements—even hundreds of statements over decades—would be accepted in the psychological community as an appropriate basis for a conclusion.

### 5.3. The known or potential rate of error

The absence of any sort of quantitative analysis also means that Grunert's opinion has no known error rate in the sense of a rate at which persons in comparable situations do not experience the emotions Grunert identified. Although in his report he frames his opinion as if each of his hundreds of patients gave identical accounts of the emotions they experienced (ECF No. 40-2 at 4), at his deposition he hedged and characterized the statements as "pretty uniform." (ECF No. 40-1 at 10, 37:11.) He also acknowledged in his testimony that people experience trauma differently. (ECF No. 40-1 at 10, 35:17-20.)

Thus, even if Grunert's methodology were an appropriate means of assessing what persons generally feel in the moments they believe they are about to die, there would be significant doubts as to whether he "reliably applied the principles and methods to the facts of the case." *See* Fed. R. Evid. 702(d); *see also Kumho Tire*, 526 U.S. at 154 (discussing that the trial court's assessment is not on the reliability of a methodology generally but on the reliability of the methodology to answer the specific question at issue in the particular case). Despite acknowledging that persons experience trauma differently, Grunert made no effort to identify whether Charles, based on his personality and other characteristics, likely would have been within the group that experienced the specific emotions Grunert identified.

### 5.4. The existence and maintenance of standards controlling the technique's operation

Grunert did not articulate any standards that he created or employed in the application of his novel and unique theory. Rather, he appears to operate from the presumption that anyone who experienced a situation where he believed he was about to die would likely have experienced the emotions he identified. He seemed to make little to no effort to control for variables, such as the person's personality and personal history, the nature of the life-threatening event, or the circumstances that led him to fear he was going to die. He derived his theory from a population of his patients, but he made no effort to evaluate whether his patients were representative of the broader population or that Charles would likely be within the population he relied on.

There is also no indication that he relied on any standards or controls in collecting the data he relied on. For example, the frequency at which survivors of near-death experiences report specific emotions may vary depending on whether a researcher directly asks a person if she experienced a particular emotion or if the researcher simply listens to the survivor's account to see if she reports having experienced a particular emotion.

### 5.5. Whether the technique has achieved general acceptance in the relevant scientific or expert community

Grunert has not explained or demonstrated how his opinion as to the emotions experienced by persons when they believe they are about to die has achieved general acceptance in the psychological community. As noted, there is no indication that Grunert has even expressed his opinion to the psychological community; he appears to have expressed it exclusively in the context of litigation.

Insofar as other courts' acceptance of similar opinions may fall within the scope of the "general acceptance" factor, the plaintiffs assert that "multiple courts have allowed Dr. Grunert specifically to testify as to pre-death conscious suffering." (ECF No. 46 at 12.) However, they point to only two examples. As to both they assert that Grunert's testimony was allowed over a "*Daubert* challenge." (ECF No. 46 at 12-13.)

The plaintiffs have not provided the court with decisions in either of the cases they cite, but as to one case it is unlikely that the trial court applied the *Daubert* standard. The case the plaintiffs identify—Milwaukee County Circuit Court Case

Number 11-CV-1003; *see also Wosinski v. Advance Cast Stone Co.*, 2017 WI App 51, 377 Wis. 2d 596, 901 N.W.2d 797,—was filed on January 19, 2011. *See* Wis. Cir. Ct Access, available at https://wcca.wicourts.gov. Wisconsin did not adopt the *Daubert* standard until January 31, 2011, 2011 Wis. Act 2, § 38, and the new standard applied only to cases filed after that date, *id.* § 45.

Moreover, although the Wisconsin Court of Appeals referred to Grunert's opinion in its decision, it did not assess its admissibility. *Wosinski*, 2017 WI App 51, ¶ 85. The question before the court was whether damages for pre-death pain and suffering were appropriate. *Id.* at ¶¶ 79-86. The court noted that, although other cases barred recovery for pre-death pain and suffering when there was no evidence that the decedent had suffered, here there was evidence in the form of witnesses who could describe the events and the fear on the decedent's face, as well as Dr. Grunert's opinions, which supported the jury's conclusion that the decedent experienced pain and suffering. *Id.* at ¶ 85. In any event, the fact that two Wisconsin circuit courts have allowed Grunert's opinions falls far short of showing that his opinions regarding pre-death pain and suffering have been generally accepted.

The plaintiffs also point to three federal cases that allowed expert opinions regarding pre-death pain and suffering. (ECF No. 46 at 10-11.) None is analogous.

*Spaulding v. Tate*, No. CIV.A. 3:11-18-DCR, 2012 WL 3845411 (E.D. Ky. Sept. 5, 2012), involved a motion for summary judgment, not a *Daubert* challenge. The court

denied the defense motion for summary judgment with respect to the claim for pre-death pain and suffering, noting that there was evidence that the decedent screamed in pain while trapped in a vehicle following a crash and a medical doctor offered the (apparently unchallenged) opinion that the decedent had "an interval of conscious pain and suffering and a probable sense of impending doom prior to lapsing into unresponsiveness." *Id.* at *4.

In *White v. Gerardot*, No. 1:05CV-382, 2008 WL 4372019 (N.D. Ind. Sept. 23, 2008), the defendant broadly sought to exclude a forensic pathologist's opinion that the decedent experienced conscious pain and suffering after being shot. The pathologist opined that the decedent's injuries would not have been immediately fatal, and he described the physiological processes that would lead to the decedent's death over about five to six minutes. *Id.* at *11. He concluded that during this period the decedent would have experienced physical pain from his injures as well as "the fear of impending death." *Id.* The court did not specifically address the psychological component of the pathologist's opinions. Instead, it addressed only the broad question of whether, in the absence of any direct evidence that the decedent was conscious after being shot, the pathologist's opinions were appropriate.

Finally, *A.B. v. Cnty. of San Diego*, No. 18CV1541-MMA-LL, 2020 WL 4430971 (S.D. Cal. July 31, 2020), actually serves to highlight the deficits in Grunert's opinions. In *A.B.,* the court permitted a forensic pathologist to opine that the decedent likely experienced

fear prior to his death. But he grounded his opinion on established principles of physiology and how decreasing blood oxygen levels trigger the "primitive human reflexes" "of fear, fright and flight," which the court explicitly distinguished from "a subjective state of mind." *Id.* at \*8. Grunert, on the other hand, proposes to opine as to Charles's subjective state of mind and to do so without reliance on any established principle of physiology or psychology.

### 5.6. Conclusion

Superficially, Grunert's opinions seem appropriate. His conclusions that Charles likely felt fear, anxiety, terror, horror, helplessness, hopelessness, and despair in the moments before he died seem intuitively correct. And it seems reasonable to let a psychologist opine as to what a particular person likely felt, especially when he can say he talked to hundreds of people about what they felt in similar situations. But Rule 702 does not allow the court to admit an opinion simply because it strikes the court as likely correct. And *Daubert* demands a far more rigorous methodology than a person's general sense of what persons have told him. Every *Daubert* factor weighs against the admission of Grunert's opinions. Consequently, the court must grant the defendant's motion to exclude Grunert as an expert.

**IT IS THEREFORE ORDERED** that "Plaintiffs' Motion for Leave to Supplement Expert Report" (ECF No. 33) is **dismissed as moot**.

**IT IS FURTHER ORDERED** that the defendant's motion to exclude Hargarten's "opinions regarding whether Mr. Leibfried was conscious in the minutes after his accident" (ECF No. 37) is **granted**.

**IT IS FURTHER ORDERED** that the defendant's motion to exclude Grunert's "expert opinion that Mr. Leibfried would have felt conscious pain and suffering from the time of the accident until he lost consciousness" (ECF No. 39) is **granted**.

**IT IS FURTHER ORDERED** that the defendant's motion for oral argument (ECF No. 50) is **denied**.

**IT IS FURTHER ORDERED** that the plaintiffs' motion for supplemental briefing (ECF No. 51) is **denied**.

Dated at Milwaukee, Wisconsin this 20th day of June, 2023.

WILLIAM E. DUFFIN
U.S. Magistrate Judge